10 CV 7087

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARI A. SCHOTTENSTEIN,

                    Plaintiff,

     -against-

VINTAGE CAPITAL MANAGEMENT, LLC,
VINTAGE PARTNERS, G.P., LLC, VINTAGE
ADVISERS, LLC, VINTAGE PARTNERS, L.P.,
KAHN CAPITAL MANAGEMENT, LLC, and
BRIAN R. KAHN,

                    Defendants.

**NOTICE OF REMOVAL**



Defendants Vintage Capital Management, LLC, Vintage Partners, G.P., LLC,

Vintage Advisers, LLC, Vintage Partners, L.P., Kahn Capital Management, LLC, and Brian

R. Kahn (hereinafter "Defendants") hereby give notice of their removal of a civil action

captioned *Ari A. Schottenstein v . Vintage Capital Management, LLC, Vintage Partners,*

*G.P., LLC, Vintage Advisers, LLC, Vintage Partners, L.P., Kahn Capital Management, LLC,*

*and Brian R. Kahn,* Index No. 651198/2010, from the Supreme Court of New York

County, New York, to the United States District Court for the Southern District of New

York. This Notice of Removal is filed pursuant to 28 U.S.C. §§ 1441(a) and 1446. As

grounds for removal, Defendants state as follows:

    1.      Plaintiff commenced this action by filing a complaint on August 5, 2010 in the

Supreme Court of The State of New York, New York County, New York.

Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served

in this matter are attached hereto as Exhibit "A".

2.      This is a civil action over which the Federal Courts have original jurisdiction under 28 U.S.C. § 1332, which may be removed under 28 U.S.C. § 1441(a).

3.      Venue is not proper in this Court under 28 U.S.C. § 1391and this matter should be transferred to the Middle District of Florida (Orlando Division) where all Defendants reside.

3.      Jurisdiction is proper under 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000.

4.      Plaintiff is a citizen of New York, and Defendants are all citizens of Florida.

5.      Plaintiff claims he is owed between $2.2 - $3.4 million, which satisfies the amount-in-controversy requirement.

6.      This action has been removed within 30 days of the service of the complaint on August 16, 2008. Accordingly, this Notice of Removal is timely under 28 U.S.C. § 1446(b), which provides that the notice of removal of a civil action shall be filed within 30 days after receipt by the defendant, through service or otherwise, with a copy of the initial pleading.  Pursuant to 28 U.S.C. §§ 1441 and 1446, removal of the above-entitled state court action to this Court is appropriate.

9.      Defendants reserve the right to amend or supplement this Notice of Removal.

10.      Defendants reserve all defenses.

11.      Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being

served on Plaintiff's counsel and filed with the Clerk of the Supreme Court of the State of

New York, County of New York, New York.

    WHEREFORE, this Court has jurisdiction pursuant to 28 U.S.C. § 1332 and removal

pursuant to 28 U.S.C. § 1441(a) is appropriate.

Dated:  September 15, 2010
        New York, New York

                                    Yonaton Aronoff (3492)
                                    Foley & Lardner LLP
                                    90 Park Avenue
                                    New York, NY 10016
                                    (212) 338-3413
                                    (212) 682-2329 (facsimile)
                                    *Attorneys for Defendants*

FILED: NEW YORK COUNTY CLERK 08/09/2010

NYSCEF DOC. NO. 4

INDEX NO. 651198/2010

RECEIVED NYSCEF: 08/09/2010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------X

ARI A. SCHOTTENSTEIN,

                  Plaintiff,

    - against -

VINTAGE CAPITAL MANAGEMENT, LLC,
VINTAGE PARTNERS, G.P., LLC, VINTAGE
ADVISERS, LLC, VINTAGE PARTNERS, L.P.,
KAHN CAPITAL MANAGEMENT, LLC and
BRIAN R. KAHN,

                  Defendants.

-----------------------------------------------------------------X

Index No. 651198/10
Date Filed: 08/05/2010
Plaintiff designates New York
County as place of trial.

**AMENDED SUMMONS**

Basis of Venue is Plaintiff's and
Defendants' residence

Plaintiff's address is:
60 West 23rd Street
New York, New York 10010

**TO THE ABOVE NAMED DEFENDANTS:**

        **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiff's attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded herein. The basis of the venue designated is that Plaintiff and/or Defendants reside in New York County.

Dated: New York, New York
      August 6, 2010

                          MORRISON COHEN LLP

By:            _____
                          Y. David Scharf
                          Ethan R. Holtz
                          909 Third Avenue
                          New York, NY. 10022
                          Telephone: 212-735-8600
                          *Counsel for Plaintiff*

#2382304 v1 \021864 \0002

PERSON SERVED :
DATE : 8-16-10
TIME : 5pm
PROCESS SERVER : D Britton
0596

PERSON SERVED : _____

DATE : _____

TIME : _____

PROCESS SERVER : _____

TO:    **VINTAGE CAPITAL MANAGEMENT, LLC**
60 W. 23rd STREET, #910
NEW YORK, NEW YORK 10010

5506 WORSHAM COURT
WINDERMERE, FLORIDA 34786

**VINTAGE PARTNERS, G.P., LLC**
60 W. 23rd STREET, #910
NEW YORK, NEW YORK 10010

5506 WORSHAM COURT
WINDERMERE, FLORIDA 34786

**VINTAGE ADVISERS, LLC**
60 W. 23rd STREET, #910
NEW YORK, NEW YORK 10010

5506 WORSHAM COURT
WINDERMERE, FLORIDA 34786

**VINTAGE PARTNERS, L.P.**
60 W. 23rd STREET, #910
NEW YORK, NEW YORK 10010

5506 WORSHAM COURT
WINDERMERE, FLORIDA 34786

**KAHN CAPITAL MANAGEMENT, LLC**
60 W. 23rd STREET, #910
NEW YORK, NEW YORK 10010

5506 WORSHAM COURT
WINDERMERE, FLORIDA 34786

**BRIAN R. KAHN**
5506 WORSHAM COURT
WINDERMERE, FLORIDA 34786

FILED: NEW YORK COUNTY CLERK 08/05/2010
NYSCEF DOC. NO. 2

INDEX NO. 651198/2010
RECEIVED NYSCEF: 08/05/2010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X
ARI A. SCHOTTENSTEIN,                              :
                                                   :   Index No.   *651198/10*
                                    Plaintiff,     :
                                                   :
        - against -                                :
                                                   :
VINTAGE CAPITAL MANAGEMENT, LLC,                   :
VINTAGE PARTNERS, G.P., LLC, VINTAGE              :
ADVISERS, LLC, VINTAGE PARTNERS, L.P.,            :
KAHN CAPITAL MANAGEMENT, LLC, and                 :
BRIAN R. KAHN                                      :
                                                   :
                                    Defendants.    :
------------------------------------------------------------X

## COMPLAINT

Plaintiff Ari A. Schottenstein ("Schottenstein"), by his undersigned attorneys, Morrison Cohen LLP, as and for his Complaint against Defendants Vintage Capital Management, LLC ("VCM"), Vintage Partners, G.P., LLC ("VPGP"), Vintage Advisers, LLC ("VA"), Vintage Partners, L.P. ("VP" or the "Fund"), Kahn Capital Management, LLC ("KCM") and Brian R. Kahn ("Kahn"), alleges as follows:

### Nature Of The Action

1.      Schottenstein brings this action for breach of contract, partnership accounting dissolution, quantum meruit and breach of fiduciary duty to redress Kahn's attempts to profit from the fruits of Schottenstein's labor and deny him the agreed upon compensation he is owed.

2.      After Schottenstein performed as a diligent and dedicated partner for nearly two years to help launch a new private equity fund venture, Kahn unceremoniously dumped him and refused to pay him the compensation he had earned for his efforts.

#2381587 v1 \021864 \0002

3. Schottenstein and Kahn were party to both an express contract and oral partnership agreement, which entitle Schottenstein to the relief he now seeks for all of his hard work and dedication to Kahn and Defendant's efforts.

### Facts Common To All Claims For Relief

**Parties**

4. Schottenstein is an individual who resides in New York, New York. Schottenstein is a veteran of the private equity industry, having worked for eight years at both prominent investment banks and investment firms focusing on private equity.

5. Kahn is an individual who resides in Windermere, Florida, and is the founder and managing partner of KCM and VCM.

6. VP is a Delaware Limited Partnership, with offices in New York, New York, Windermere, Florida and Milton, Massachusetts. VP is a value oriented private equity fund designed to capitalize on public and private corporate opportunities arising from pricing dislocations in the lower-middle market.

7. VPGP is a Delaware Limited Liability Company with offices in New York, New York, Windermere, Florida and Milton, Massachusetts, that was formed to act as the sole general partner of VP.

8. VA is a Delaware Limited Liability Company with offices in New York, New York, Windermere, Florida and Milton, Massachusetts, that was formed to act as the investment manager of VP.

9.     VCM is a Delaware Limited Liability Company, with offices in New York, New York, Windermere, Florida and Milton, Massachusetts.  VCM was formed by Kahn to serve as the fund manager of VP.

10.     KCM is a Delaware Limited Liability Company with offices in New York, New York, Windermere, Florida and Milton, Massachusetts.  KCM is an investment vehicle founded by Kahn, which has been described as a "predecessor" to VCM.

**Jurisdiction And Venue**

11.     This Court has jurisdiction over the Defendants, who regularly transact business in New York.

12.     Venue is proper in this County pursuant to CPLR 503, because Plaintiff and Defendants are residents of New York County.

**Schottenstein Meets Kahn and Agrees to Assist In Building VCM and VP**

13.     In late 2008, Schottenstein and Kahn began holding discussions about working together to start a new private equity venture.

14.     Kahn was interested in bringing on Schottenstein and his colleague Alan Poussaint ("Poussaint") to work for KCM to start this new venture.

15.     To that end, Kahn asked Schottenstein to prepare a proposal that would set forth the terms under which Schottenstein would commence working with Kahn.

16.     On December 18, 2008, Schottenstein sent Kahn an initial proposal (the "Initial Proposal"), that outlined the services he believed he could perform for KCM and the compensation he expected to receive in return.

#2383587 v1 \021864 \0002

3

17.     The services included in the Initial Proposal included transaction execution, transaction sourcing and the potential use of Schottenstein's existing relationships to broaden KCM's investor base.

18.     The Initial Proposal was not accepted by Kahn, but the parties continued to discuss terms.

19.     After meeting with Kahn in both New York and Florida, on or about March 16, 2009, Schottenstein sent Kahn a prospective timeline with two Excel spreadsheets that clearly illustrated the compensation terms he expected receive for his services.

20.     After receiving these terms from Schottenstein, Kahn verbally agreed to them.

21.     After providing that verbal agreement, on or about April 8, 2009, Schottenstein, Poussaint and Kahn entered into a contract (the "Memorandum of Understanding" or "MOU") with KCM, which details the services Schottenstein was to perform and compensation he would receive as a partner of VP and member of VCM.

**The Terms Of The MOU**

22.     The MOU first provides that its purpose is to set forth the terms pursuant to which Schottenstein and Poussaint would assist in establishing a "New York presence" for KCM and to aid KCM in establishing VP, which was to be "a $50-100 million fund focused on special situation and select distressed opportunities."

23.     Pursuant to the MOU, Schottenstein and Poussaint would provide, *inter alia*, the following services:

        (a) Fundraising and Capital Introductions;

#2381587 v1 \021864 \0002

4

(b) Establishment of New York Presence for KCM/VP;

(c) Transaction Sourcing and Execution

24.     For those services, Schottenstein and Poussaint were to receive compensation in three components.

25.     First, Schottenstein and Poussaint were to receive an annual draw from KCM of $350,000 for use in the start up of a New York Office, including salaries, compensation of third party consultants, due diligence expenses, travel and entertainment, employee benefits, rent and insurance.

26.     Next, Schottenstein and Poussaint were to receive Carried Interest, calculated at 1.15-10.00 points (5.75%-50.00%) of the carried interest on capital under management in VP, depending on whether it was attributable to them or not.

27.     Finally, Schottenstein and Poussaint were to receive 50% of all management fees that VCM would derive from capital under management in VP that was attributable to their efforts.

28.     On April 9, 2009, Kahn executed and returned the MOU.

29.     A few days later on April 13, 2009, Kahn told Schottenstein that he intended to move forward and secure New York office space for him, that Schottenstein should print out KCM business cards for his meetings with potential investors and that he should use a KCM email address and begin performing services pursuant to the MOU.

**Schottenstein Diligently Performs Service For KCM, VCM and VP**

30.     After Kahn executed the MOU, Schottenstein began diligently performing his services for KCM, which included vital functions laying the "ground work" for what would become VP and consequently, VPGP, VCM and VA as well.

31.     From mid-April through June of 2009, Schottenstein worked closely with Kahn and KCM's attorney, Gilbert Davis ("Davis") of Sims Moss Kline & Davis LLP ("SMKD"), to revamp and improve for distribution all marketing and legal documents related to VP, including the Limited Partnership Agreement (the "LPA"), Private Placement Memorandum (the "PPM"), Investor Presentation, Investment Overview, Track Record Information, Due Diligence Reports and other documents.

32.     Schottenstein also created analytical Excel models/scenario analyses for White Electronic Designs Corporation ("WEDC"), a company in which Kahn was an investor and board member and for which Kahn intended to raise additional third party capital to be invested via Kahn controlled investment vehicles called Caiman Partners, LP and Desert Equity, LP.

33.     Schottenstein also held numerous calls and meetings with potential investors interested in learning more about VP and arranged several calls and meetings between Kahn and potential investors.

34.     Also, during May-June 2009, Kahn's involvement in WEDC increased and he asked Schottenstein to assemble investor presentations and analytical models illustrating the value proposition of a potential WEDC tender offer  (the "Tender") planned for August and subsequent open market purchases of WEDC stock (together with the Tender, the "Desert Equity Transaction").

#2381587 v1 \021864 \0002

6

35.     During that time, Schottenstein arranged a series of investor calls and meetings in New York to discuss both VP and the Desert Equity Transaction, which Kahn attended.

36.     While Kahn was in New York for those meetings, Schottenstein asked him what his expectations were regarding timing on launching VP.

37.     Kahn reiterated his dedication to launching VP as soon as the Desert Equity Transaction had been completed (which he stated would likely be within 10-14 months) and informed Schottenstein that he would be a full general partner in VP when it was launched.

38.     From that point forward, Kahn began referring to Schottenstein as his "partner" in meetings with investors and Schottenstein began referring to himself as the same.

39.     Kahn also paid Schottenstein $7,000 at that time, since he had yet to make any payments pursuant to the MOU and Schottenstein had borne all Kahn related expenses out of his own pocket.

40.     Also on that same trip, Kahn asked Schottenstein if any of the people who Schottenstein had approached about making introductions to investors would require "finder's fees."

41.     Schottenstein responded by saying that in the case certain individuals did require such fees, he, as a partner, would pay such fees from the amounts allocated to him pursuant to the MOU entered into by Schottenstein and Kahn earlier that year.

42.     Discussions with investors about VP and the Desert Equity Transaction continued throughout June and July, and Private Offering Memoranda and LPAs that Schottenstein helped prepare were distributed to several investors at Kahn's request in late July and August.

**The Desert Equity Transaction**

43.     In August, KCM launched a Tender offer for approximately 18% of WEDC's outstanding shares.

44.     This WEDC Tender offer closed in late September 2009, and its successful close generated significant excitement among investors Schottenstein had contacted in the previous months about both the Desert Equity Transaction and VP.

45.     Indeed, Schottenstein caused an LLC called Adalin Holdings, of which Schottenstein is a 50% owner, to invest $100,000 in this WEDC tender offer.

46.     In completing the Tender offer (which expired on Wednesday, September 16, 2009), Kahn told Schottenstein on or around Thursday, September 17, 2009, that he only had access to approximately $11 million of the approximately $14 million required to purchase WEDC shares tendered to Kahn in the Tender.

47.     Kahn said that he lacked sufficient capital to close the Tender and required up to $3 million in emergency funding by Monday, September 21, 2009 in order to close the Tender.

48.     Kahn also said that the Desert Equity Transaction could unravel completely without this emergency funding, and this unraveling would place Kahn's and Schottenstein's plans for launching VP into serious jeopardy due to the critical loss of credibility throughout the marketplace if the transaction were to fall through.

49.     In order to satisfy this shortfall, Kahn asked Schottenstein to source up to $3 million in short term financing to allow him to close the Tender, which Schottenstein sourced and offered to Kahn by Saturday, September 19, 2009 (Kahn eventually utilized alternative emergency funding from another source in order to close the Tender).

50.     Subsequent to the Tender, and at Kahn's request, Schottenstein again approached a series of investors about the possibility of investing alongside Kahn in subsequent open market purchases of WEDC stock via the Desert Equity Transaction.

51.     This resulted in approximately 20 investors investing approximately $4 million in the Desert Equity Transaction as a result of Schottenstein's efforts, (a total of approximately 25-30% of the total external investment in the Desert Equity Transaction).

52.     In October 2009, Schottenstein arranged a trip to Dallas, Texas, to both meet with an intermediary about a potential investment opportunity for KCM or VP and to meet with potential investors in VP and/or the Desert Equity Transaction.

53.     At these meetings, Kahn, introduced Schottenstein as his "partner" and explained that they had been working together since 2008.

54.     In December 2009, Schottenstein approached Kahn and told him that it had been another six months since he had last received any compensation (despite bearing expenses directly associated with Kahn related work), and that he thought it was fair and reasonable that he receive another payment given his hard work and success in generating business, assisting on transactions, and establishing and/or accessing relationships for the benefit of KCM/VCM/VP.

55.     Schottenstein felt $14,000 would be necessary for the next three months and indicated so to Kahn.

56.     Schottenstein also promised Kahn that if they still had not launched VP after three months, they would need to have another discussion about establishing more recurrent forms of compensation.

#2381587 v1 \021864 \0002

57.     Schottenstein further explained that he felt that since the VP offering documents were nearing completion, it was appropriate to begin working on management agreements including operating agreements and formation documents for VCM, VA, VPGP (the "Management Agreements") that would more formally define Schottenstein's compensation as a partner in VP and a member in VCM/VA/VPGP.

58.     Kahn agreed to pay Schottenstein the requested amount and promised that Schottenstein had no need to worry about setting forth formal compensation arrangements because Kahn's counsel was already working on formal Management Agreements and Schottenstein would be "very happy" with his compensation package when it was presented to him and VP was launched.

59.     Kahn instead urged Schottenstein to focus his efforts on completing the VP PPM, LPA and Subscription Documents (the "Fund Documents") as expeditiously as possible in preparation for launch of the Fund.

60.     Kahn further stated that given the substantial level of activity related to the Desert Equity Transaction, Kahn personally would be unable to focus on the Management Agreements until "things settled down," and urged Schottenstein to "keep his eyes on the prize" (referring to the launch of the Fund and substantial carried interest and/or management fees related thereto and attributable to Schottenstein).

## Schottenstein Continues To Serve KCM, VCM and VP

61.     Per Kahn's requests, Schottenstein continued to perform his services pursuant to the MOU and in January through February 2010, focused primarily on communications with

Desert Equity Transaction investors, keeping them informed of the latest updates vis-à-vis WEDC.

62.     In addition, Schottenstein began to address numerous administrative issues related to the pre-launch of VP, including establishing a VCM SharePoint account, creating and uploading numerous documents for use by all VCM partners, continued updating of all VP/VCM marketing materials and track record information to reflect the latest developments, sourcing and tracking of new and potential VP/VCM/KCM investment opportunities, review, modification and correction of the Fund Documents and creation of a VCM website.

63.     The VCM website, which was approved by Kahn, all VCM partners and VCM's counsel, SMKD, was designed, written, modified, maintained and periodically improved by Schottenstein.

64.     Schottenstein also introduced a new transaction opportunity called LGS to Kahn and KCM, who expressed interest in the transaction.

65.     To that end, Schottenstein held a series of due diligence calls with both management of LGS and their advisor and created an investment memorandum summarizing the company and its operations, its historical and projected financial performance, proposed investment structure and investment recommendation, which was subsequently disseminated to all partners of VCM/KCM including Kahn.

66.     In addition, Schottenstein created a term sheet for the proposed investment structure after negotiating an acceptable investment framework with the company and its advisor.

67.     Kahn, however, eventually declined the transaction.

#2381587 v1 \021864 \0002

11

68.     During 2009-10, Schottenstein introduced Kahn and KCM to approximately ten other transactions which Kahn indicated were sufficiently interesting to warrant further diligence and for which Kahn either executed non-disclosure agreements in order to receive additional information, or authorized Schottenstein to do so and conduct exploratory due diligence on Kahn/KCM's behalf.

69.     In March 2010, after a series of discussions with investors and advisors about the possibility of modifying certain investment terms of VP, Kahn asked Schottenstein and Andrew Laurence ("Laurence"), another partner, to begin revamping the Fund Documents for VP, which, it was agreed, needed to be scrapped entirely in favor of a fully new set of documents since the original set of Fund Documents were no longer appropriate given the revised Fund terms.

70.     Schottenstein worked extensively with VCM's counsel, SMKD, Kahn and Laurence to create correct and effective LPA, PPM and Subscription Documents for VP.

71.     Schottenstein single-handedly created from scratch the vast majority of the PPM and heavily edited and modified the LPA to ensure proper reflection of all agreed upon Fund terms.

72.     This work was undertaken by Schottenstein in an effort to achieve Kahn's stated goal of all investor-facing VP documentation, including the Investor Presentation, LPA, PPM, Subscription Documents and Investment Summary (the "Investor Facing Documents") being completed by March 30, 2010, which Kahn set as a deadline in mid-March 2010.

73.     These Investor Facing Documents were timely completed and indeed refer to Schottenstein as a "Partner" of VP and member of the VCM "Management Team."

74.    In fact, in several IRS SS-4 Filings for VCM and VP, Kahn disclosed that each LLC contains four members, which includes Schottenstein.

**Schottenstein Makes Repeated Requests To Finalize The Management Agreements**

75.    At the same time Schottenstien was completing the final Investor Facing Documents for VP, Schottenstein requested that Kahn and/or his counsel, SMKD, provide the other partners/managers of VP and VCM with Management Agreements since it would be impossible to launch VP without these agreements, regardless of when the other VP documentation had been completed.

76.    On or about March 30, 2010, it was announced that WEDC had entered into an agreement to be acquired by Microsemi Corporation ("MSCC") through a tender offer expected to close on April 30, 2010.

77.    This close would be followed shortly by the completion of the Desert Equity Transaction (i.e., the date of final distribution of proceeds to Desert Equity Transaction investors).

78.    On March 30, 2010, Schottenstein again requested that Kahn formalize Management Agreements for VP.

79.    Also, since three months had passed since Schottenstein last received any compensation from Kahn, Schottenstein requested from Kahn that, as agreed, they re-visit the issue of recurring compensation for his services, which at this point had been provided by Schottenstein to Kahn for more than 12 months.

80.    In a telephone conversation, Kahn told Schottenstein that he expected to hold a first close on VP in the first week of May, and that Schottenstein would be paid regular and

#2381587 v1 \021864 \0002

13

recurring compensation as a general partner of VP and member of VA/VCM immediately after that first close occurred.

81.     When Schottenstein questioned the feasibility of holding a first close in just over a month since VP's documentation was still not ready for distribution and since the Desert Equity Transaction was not expected to close until April 30, 2010, Kahn indicated that if a first close did not occur in early May, he would consider making advances to the partners/members out of his own pocket.

82.     In early April 2010, Schottenstein emailed to Kahn, Kahn's counsel, SMKD and the VCM partners a standard list of items (the "Manager List of Terms") addressed in typical private equity management agreements and that Schottenstein felt should be addressed in the Management Agreements, which Kahn said were in the process of being drafted by his counsel, SMKD.

83.     On or about April 7, 2010, Davis emailed the proposed draft Management Agreements for "initial review" by the partners/members (the "Kahn Proposal Documents").

84.     The terms of the Kahn Proposal Documents clearly did not reflect the agreement Schottenstein and Kahn had arrived at and entered into via the MOU and under which Schottenstein had been operating for the past 12 months.

85.     The Kahn Proposal Documents also failed to address numerous critical issues contained in the Manager List of Terms, which are addressed in typical agreements of this kind in order to ensure clear understandings among partners under various scenarios and to prevent future dissent in the ranks of the managers, which could have deleterious effects on Fund investors, its portfolio companies and its partners.

#2381587 v1 \021864 \0002

14

86.     Due the fact that the Desert Equity Transaction was scheduled to close on April 30, 2010, and that Kahn had stated that all Investor Facing Documents were required to be ready for distribution to investors at that time, Schottenstein spent the vast majority of his time over the month of April focused on ensuring all Investor Facing Documents for VP were finalized per Kahn's instructions.

87.     In late April 2010, Kahn visited New York and held investor meetings with Schottenstein and Laurence.

88.     In certain of these meetings, Kahn stated to investors that Schottenstein was a partner in VP and that Schottenstein would be compensated $200,000 per year and given a 5% share of the carried interest (terms consistent with the Kahn Proposal Documents) despite the fact these agreements had not been signed or agreed to by Schottenstein.

89.     Kahn also stated to investors that Schottenstein would be investing in VP and Schottenstein did not raise any objection to Kahn's statements so as not to "raise red flags" in front of investors in the midst of meetings and to allow for an appropriate forum for discussion of this and related issues.

**Kahn Reverses Course In Bad-Faith And Reneges On His Agreement with Schottenstein**

90.     Once the Desert Equity Transaction closed on April 30, 2010, at Kahn's request, Schottenstein spent the subsequent weeks preparing wire orders, informing investors of the successful conclusion to the Desert Equity Transaction, informing investors of the imminent launch of VP and answering investor questions about VP, its strategy and its structure.

91.     Immediately thereafter, Kahn tasked Schottenstein with distributing and tracking nearly 200 emails to potential investors enclosing VP's Investor Facing Documents and Fund documentation.

92.     On May 2, 2010, Schottenstein sent Kahn an email requesting clarification as to why the Kahn Proposal Documents were so one sided and why they deviated so substantially from the terms of the MOU, under which Schottenstein had been operating for the prior 12+ months.

93.     Kahn failed to provide clarification to these points, and instead offered the explanation that "it's just the way I've always done it and I'm not going to change it now."

94.     Schottenstein then requested Kahn remember his pledge to consider advancing funds in the case a first close had not occurred by early May and Kahn agreed to provide Schottenstein with $22,000 (the "Advance").

95.     However, Kahn proposed to Schottenstein that this $22,000 would be a zero-interest personal loan.

96.     Schottenstein agreed only to the extent that the Advance would be just that; an advance to be repaid out of his proceeds to be earned as a partner of the Fund, which Kahn agreed to.

97.     Consistent with that agreement however, Kahn wrote the word "Loan" on the check sent to Schottenstein for the Advance.

98.     Throughout May 2010, Schottenstein continued to assist Kahn in tracking and distributing materials to investors, reviewing documentation provided by intermediaries for potential transactions, and fulfilling all requests made of him.

#2381587 v1 \021864 \0002

16

99.    On June 11, 2010, Kahn forwarded Schottenstein the MOU and asked Schottenstein whether said agreement was what he had been expecting as a far as compensation for his partnership/membership interests was concerned.

100.    Schottenstein replied that he had been expecting terms consistent with or superior to those set forth in the MOU.

101.    In a suspicious turn of events, Kahn called Schottenstein a few days later and informed him that Schottenstein had "created lots of problems for him" and that Kahn and Davis had devised a way to allow him to have the terms set forth in the MOU, but which would require Schottenstein to become an independent consultant to VP.

102.    When Schottenstein asked how such an arrangement might work and told Kahn that it was not acceptable that he would not be a partner, Kahn said he no longer wanted to speak with Schottenstein about the issue and Schottenstein could instead discuss it with his counsel, Davis.

103.    On June 23, 2010, Schottenstein sent Davis a new employment letter (the "New Proposal") incorporating the terms he would be willing to accept, since neither the Kahn Proposal Documents nor the independent consultant arrangement provided Schottenstein the partner level position with economic terms reflective of the MOU that the parties had agreed to.

104.    In a stunning turn events and clear display of bad-faith, after all the service Schottenstein had performed, on or about June 29, 2010, Kahn sent Schottenstein an email ultimatum demanding that Schottenstein walk away from the compensation due him and agree to a mutual release or face the prospect of "disgorgement of profits from the gains by you, your family, and your friends that participated under false pretenses in Desert Equity LP."

#2381587 v1 \021864 \0002

17

105.    Pursuant to the terms of the MOU, all the services provided by Schottenstein entitled him to payment of between $2.2-3.4 million in salary expenses and bonuses.

106.    Kahn, KCM and VP have failed to pay Schottenstein a dime and Schottenstein now brings this action to ensure he is paid what is due him.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach Of Contract Against KCM)

107.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 106 as if fully set forth herein.

108.    The MOU is a binding and enforceable contract between Schottenstein and KCM.

109.    Pursuant to the terms of the MOU, Schottenstein is owed between $2.2-3.4 million in salary expenses and bonuses.

110.    Schottenstein fully performed his obligations pursuant to the MOU.

111.    KCM breached the MOU by failing to pay Schottenstein for his services.

112.    As a result of KCM's breach, Schottenstein has been damaged in the amount of between $2.2-3.4 million in salary expenses and bonuses.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Duty To Negotiate In Good Faith Against KCM, VP, VA, VPGP and VCM)

113.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 112 as if fully set forth herein.

114.    The MOU is an agreement that expresses mutual commitment to contract on agreed upon major terms, while recognizing the existence of open terms that remain to be

negotiated and is a preliminary binding commitment that carries with it the duty to negotiate in good faith the parties' final Management Agreements.

115.   The MOU was clearly intended to be binding.

116.   Each party remained committed and performed their respective services while final Management Agreements were being negotiated.

117.   Schottenstein diligently performed his obligations while final Management Agreements were being negotiated.

118.   The essential terms to provide the framework for the final Management Agreements, compensation and services, were contained in the MOU.

119.   After Schottenstein dutifully performed all services he was required to pursuant to the MOU, KCM, VA, VP, VPGP and VCM refused to negotiate final Management Agreements and walked away, down a path of clearly bad-faith threats.

120.   Schottenstein has been damaged as a result, in an amount to be determined at trial that exceeds between $2.2-3.4 million.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Dissolution/Accounting Against VP, VA, VPGP and VCM)

121.   Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 120 as if fully set forth herein.

122.   The MOU was to set out the terms for Schottenstein's general partnership interest in VP and membership interests in VA, VPGP and VCM.

123.    Based upon those terms, Kahn and Schottenstein entered into an oral agreement that Schottenstein was a general partner of VP and member of VA, VPGP and VCM, which agreement was performed by Schottenstein.

124.    Indeed, Kahn repeatedly referred to Schottenstein as a "partner" in press releases and to potential investors and the VP offering documents also refer to Schottenstein as a "Partner" of VP and member of VCM, as well as part of the VP "Management Team."

125.    Since Schottenstein was expelled as a partner and member of VP and VA, VPGP and VCM respectively, he is entitled pursuant to N.Y. Partnership Law § 75 and N.Y. Limited Liability Company Law §§701, 704, to an accounting between all of the partners and members, a dissolution of those entities and a distribution for the value of his interests.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Quantum Merit Against KCM, VP, VA, VPGP and VCM)

126.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 125 as if fully set forth herein.

127.    Schottenstein performed services on behalf of KCM, VP, VA, VPGP and VCM.

128.    The reasonable value of the services performed by Schottenstein on behalf of KCM, VP and VCM is between $2.2-3.4 million.

129.    Schottenstein has not been paid for his services and is entitled to compensation for their reasonable value.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Breach Of Fiduciary Duty Against Kahn)

130.   Plaintiff repeats and realleges Paragraphs 1 through 129 as if fully set forth herein.

131.   As a partner in VP, Kahn owed Schottenstein a fiduciary duty of utmost loyalty.

132.   Kahn breached his fiduciary duty to Schottenstein by terminating him without cause or reason to the detriment of Schottenstein and the partnership.

133.   Schottenstein has been damaged in an amount to be determined at trial, but believed to exceed $4 million.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Declaratory Judgment Against Kahn)

134.   Plaintiff repeats and realleges Paragraphs 1 through 133 as if fully set forth herein.

135.   On August 5, 2010, counsel for Kahn sent Schottenstein's counsel a letter demanding the repayment of the Advance.

136.   The Advance was a loan only to the extent that it was to be repaid out of Schottenstein's profits from the Fund.

137.   Since Kahn has not paid Schottenstein any proceeds, Schottenstein has no obligation to repay the Advance.

138.   Accordingly, an actual dispute exists between Schottenstein and Kahn as to Schottenstein's obligation to repay the Advance.

139.   Since the Advance paid to Schottenstein was understood by the parties to be an advance against profits Schottenstein would earn only and there was never any agreement by Schottenstein to repay the funds outside of that, this Court should declare that Schottenstein has no obligation to repay the Advance.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants, as follows:

(a) On Plaintiff's First Cause of Action for Breach of Contract, against KCM for damages in an amount to be determined at trial, but believed to exceed between $2.2-$3.4 million;

(b) On Plaintiff's Second Cause of Action for Breach of Duty to Negotiate in Good Faith against KCM, VP, VA, VPGP and VCM, judgment for damages in an amount to be determined at trial;

(c) On Plaintiff's Third Cause of Action for Dissolution and Accounting against VP, VA, VPGP and VCM, judgment dissolving each entity and awarding Plaintiff his appropriate share and distribution;

(d) On Plaintiff's Fourth Cause of Action for Quantum Meruit against KCM, VP, VA, VPGP and VCM, damages in an amount to be determined at trial, but believe to be between $2.2-$3.4 million;

(e) On Plaintiff's Fifth Cause of Action for Breach of Fiduciary Duty against Kahn, damages in an amount to be determined at trial, but believed to exceed $4 million, plus punitive damages;

#2381587 v1 \021864 \0002

22

   (f) On Plaintiff's Sixth Cause of Action for Declaratory Judgment against Kahn,

judgment declaring that Schottenstein has no obligation to repay the Advance.

   (g) Such other and further relief as the Court deems just, necessary and proper,

including costs and attorney's fees of this action.

Dated: New York, New York
   August 5, 2010

        MORRISON COHEN LLP

       By: _____
        Y. David Scharf
        909 Third Avenue
        New York, New York 10022
        (212) 735-8600
        *Attorneys for Plaintiff*